HARRY L. AINSWORTH *vs.* MOUNT MORIAH LODGE, ANCIENT, FREE, AND ACCEPTED MASONS & others.

Hampden.    September 27, 1898. — December 9, 1898.

Present: FIELD, C. J., HOLMES, KNOWLTON, BARKER, & HAMMOND, JJ.

*Lease — "Life of the Building."*

If a building, a portion of which is leased during the "life of the building," is so injured by fire as substantially to destroy the part demised and to render it impracticable for the lessee to perform the covenant to rebuild such part except by rebuilding other important parts of the building not demised, the "life of the building" may be said to have terminated, within the meaning of the lease.

TORT, against Mount Moriah Lodge, Ancient, Free, and Accepted Masons, described as a corporation, Olin C. Towle, George W. Waterman, and Stephen B. Cook, trustees of the same, for injury caused to the plaintiff's property by the fall of a wall of a building.

At the trial in the Superior Court, before *Maynard*, J., it appeared that the plaintiff occupied a store in a two-story wooden building in Westfield; that the individual defendants were the successors in office of the lessees in a lease of a portion of a three-story brick building adjacent to that occupied by the plaintiff; that the first named defendant was not a corporation; that on March 11, 1896, the brick building was greatly injured by fire; and that, about two weeks later, the walls of the building were blown down, one of them falling upon the adjoining building and damaging the plaintiff's property therein.

The jury returned a verdict for the first named defendant, by direction of the judge, and for the plaintiff against the other defendants; and they alleged exceptions, which appear in the opinion.

*H. W. Ely*, (*A. S. Kneil* with him,) for the individual defendants.

*W. H. McClintock*, (*J. B. Carroll* with him,) for the plaintiff.

HAMMOND, J.    In order to hold Towle, Waterman, and Cook, hereinafter called the defendants, it was necessary for the

plaintiff to show that at the time the wall fell the defendants had an interest in the building; and on this point his only claim was that they, as successors of the lessees named in the lease from Horton and others to Lewis and others, were at that time the holders of the leasehold estate thereby created, and that the estate was then outstanding.

One of the answers made by the defendants to this claim was that the leasehold estate was terminated by the ravages of the fire and consequently was not outstanding at the time the wall fell. If the defendants were right in this, they could not be held. Considerable evidence as to the condition of the building after the fire was introduced.

At the close of the evidence, the defendants asked the court to rule that " the life of the building had been terminated prior to the time the wall fell, and that the life of the building had been terminated by fire." The court declined so to rule, and upon this point instructed the jury as follows: " Up to the time this structure commenced to fall, where was the life of the building? Was it extinct, or was it not? If the building was still alive in the sense it is used here, then the tenants, the trustees, would be the persons liable; but if, on the other hand, the life of the building had become extinct before that time, it would be the owners who would be liable." To the refusal of the court to give the instruction as requested, and to the instructions actually given, the defendants excepted.

We think the instruction should have been given. The leasehold estate was to exist only during " the life of the building," and the real question is whether the evidence was sufficient to warrant a finding that, within the meaning of the lease, the " life of the building " had not terminated. The building was three stories in height, and had brick walls. The premises described in the lease were " all that part of the brick building known as ' Masonic Block,' situated on the corner of Elm and Arnold Streets in said Westfield, above and including the third floor of said building, together with the stairs and stairway leading from the second to the third floor of said building, to their sole use. Also the hall upon the second floor, the front and rear stairways leading to the same, and the front and rear entrances and halls leading to said stairways, to be used and occupied by said party

of the second part in common with the parties owning and occupying the other portions of said building, and their heirs and assigns."

We understand the hall upon the second floor to be not a room, but simply an entry to and from which stairways led.

The lease also contained the following : " And the party of the first part doth also lease, demise, and let unto the party of the second part the box or cupboard in the northwest corner of said building, and in the second story, to be used in connection with the third story in substantially the same manner and to the same extent as now used by said Lodge, and also the water pipes leading from the tank through the first and second stories of said building, to the drain leading to the brook, with the right to use and enjoy the same in the same manner and to the same extent that the party of the first part is entitled under said agreement between said Gillett and said party of the first part. It is also agreed that the party of the second part shall have, exercise, and enjoy all the rights and privileges to which the party of the first part is entitled, under said agreement last mentioned, subject to the restrictions and liabilities therein contained, and shall also have the right and privilege at all reasonable times, whenever necessary, to enter upon the portion of said building not herein demised, and the premises upon which the same is situated, for the purposes of examination and repair of said pipes leading from said tank, and the drain or pipe leading from the cellar, and of the box or cupboard in the second story before mentioned, and the gas pipes for the use of the third story, and for the purpose of rebuilding or replacing said pipes, drain, and cupboard and gas pipes, whenever, during the life of said building, the same shall become ruinous and decayed."

The lessees hired the premises for a Masonic Hall, and the lease was upon the condition that, if the premises should cease to be used and occupied as such, the lessors might enter and repossess the same as of their former estate.

The lessees entered into several covenants, among which were the covenants to pay " all taxes and other duties levied, or to be levied, on all that part of said building above the third floor, and to keep the same, including the third floor and the stairs

and stairway leading from the second to the third floor, in good and substantial repair, during the life of said building"; and they also agreed "to pay one quarter part of all the expense of keeping in repair all such portions of said building as are to be used in common with the owners and occupiers of the other portions, as before provided in this agreement."

There were also other covenants and agreements not material to the question under consideration. The lessors made no covenant as to repairs.

At the time of the execution of the lease the lessors were the owners of the land and building, except that Gillett, who was not a party to the lease, was the owner of the south half below the third floor; and, subject to the lease, the title so continued in them or their heirs (some of the lessors having meanwhile died) up to the time the wall fell.

Here, then, is a lease of all of the building above and including the third floor, with such rights in entries and stairways leading to the street as are incidental to the reasonable enjoyment of that part of the building, — the lessors owning the north half of the lower part of the building and the land under the whole building, and Gillett, a third party, owning the other half of such lower part. And this lease is to continue during the life of the building, the lessees agreeing to repair and the lessors not agreeing to repair either the demised premises or any other part of the building. The covenant to repair bound the lessees to rebuild in case of fire unless the term of the lease had expired. *Leavitt* v. *Fletcher,* 10 Allen 119, and cases therein cited.

In these circumstances, what is the reasonable interpretation of the phrase "life of the building"? Shall it be so interpreted as to mean that the building is alive so long as there is standing any part of it which can be used as a building? If so, then if all above the second floor is destroyed, walls and all, but the first floor can be occupied, it is the duty of the lessees to erect in the air as best they can, that part of the building demised by the lease. This does not seem to us a reasonable interpretation.

We think the life of the building may be said to have terminated, within the meaning of this lease, when the building has

been injured by fire or other cause to such an extent as substantially to destroy the part demised, and to render it impracticable for the lessees to perform the covenant to rebuild such part except by rebuilding other important parts of the building not covered by the lease.

Upon this interpretation of the phrase there can be no doubt that, as matter of law upon the evidence, the life of the building was terminated by the fire.

It was not in dispute that after the fire, and before the injury to the plaintiff's property, the roof was entirely gone, and so also was the third floor, except a " little corner " near the north wall, upon which the safe stood. The evidence, especially that given by the plaintiff and his witnesses, clearly showed that the second floor was much burned and practically useless, and that the walls were bulging out in places, and in parts were in such a weakened condition as to fall by reason of wind of no " greater violence than defendants ought reasonably to have anticipated." We have examined also the photographs used at the trial. Without reciting herein the evidence in detail, it is sufficient to say that it clearly and indisputably shows that after the fire the part demised was substantially destroyed, and that it was impracticable to rebuild the same except by rebuilding other important parts of the building not demised.

Without considering, therefore, whether the contention of the defendants that they were not the successors of the lessees above named is open to them on the bill of exceptions, or the other points presented, we are of opinion, for the reasons above stated, that the entry should be,

*Exceptions sustained.*