Thomas J. FITZMAURICE, et al
vs.
BEACON CHAMBERS
CORPORATION, et al

Civ. A. No. 11372

Housing Court Department
Trial Court of the
Commonwealth of Massachusetts

February 17, 1981

Marian H. Glaser, Julia K. Johnson, Terrence J. McLarney for the plaintiff.
James J. Marcellino, Stuart T. Rossman, for the defendant.

## FINDINGS AND ORDER

This is a petition under G.L. c. 111, §127H to enforce the Sanitary Code, brought by residents of Beacon Chambers, 19 Myrtle Street, Boston, Massachusetts, to assure that their residence is restored to a decent, safe and sanitary condition. Plaintiffs were forced to vacate the premises due to fire in that building on October 13, 1980, and they have been living in temporary

quarters since the fire. Plaintiffs further seek declaratory relief pursuant to G.L. c. 231A, § § 1 et seq.

Plaintiffs have never abandoned the premises and wish to return to their home as soon as possible. Defendant has no present intention of allowing the plaintiffs to return to the residence.

Plaintiffs bring this action on behalf of themselves and all others similarly situated.

Jurisdiction is granted this Court by G.L. c. 185C, § 3; c. 111, § 127H; c. 184, § 18 and c. 186, § 14.

The defendant Beacon Chambers Corporation owns and operates the building at 19 Myrtle Street, Boston, known as "Beacon Chambers".

Plaintiffs rented rooms at Beacon Chambers and were residing there as of October 13, 1980.

On October 13, 1980 a fire broke out in Beacon Chambers which burned the third, fourth and fifth floors of this concrete structure, resulting in scorched walls and ceilings but not resulting in structural damage to the building.

On that same day, all tenants presently residing in the building, about three hundred and sixty-three (363) men, were evacuated; some tenants returned for a short period of time.

This Court has already ruled that since the lessor must make an implied warranty of habitability to the lessee as to the physical fitness of the leased premises at the time of the commencement of the tenancy, it follows that there was an implied duty upon the lessor to make repairs. This expansion of judicial doctrine flows as a direct consequence of **Boston Housing Authority v. Hemingway**, 363 Mass. 185 (1975). Hemingway did not state that a landlord has a duty to mitigate damages even if a tenant wrongfully abandons an apartment, but that too follows naturally from the transformation of common law concepts of landlord-tenant to one of contracts. The growth pattern of case law in the area of landlord-tenant is a documentation of the judicial process in action. "For every tendency, one seems to see a counter-tendency; for every rule its antinomy. Nothing is stable. Nothing absolute. All is fluid and changeable. There

is an endless becoming." Justice Cardozo, **The Nature of the Judicial Process**, 28 (1921).

Judicial definition of public policy in the area of housing is probably among the earliest contributions to the evolutionary process of the modern body of law. Thus, it was quite natural for the **Hemingway** court to superimpose the implied warranty of habitability onto a mass of recently enacted legislation which were designed to make the enforcement of state and local housing codes more effective.

Massachusetts has pioneered tenement house law by detailing minimum health and safety standards. Even though modern codes are more comprehensive, in 1868 Massachusetts enacted a statute, applicable only to Boston, patterned on the New York Tenement House Law of 1867. See, St. 1868, c. 281, § § 1-18. And while in recent years the City of Boston has obtained substantial success in applying traditional modes of housing code enforcement, there still remain gaps in the law, by which code enforcement is rendered ineffective. The Legislature has within the past decade attempted to close the gaps. G.L. c. 186, § 13 provided additional protections for tenants-at-will by adding that "A tenancy-at-will of property occupied for dwelling purposes shall not be terminated by operation of law by the conveyance, transfer or leasing of the premises by the owner or landlord thereof." If the Legislature has repudiated the doctrine that a tenancy-at-will can be terminated by operation of law, it is incongruous that a fire would terminate that tenancy, where the premises, although uninhabitable for the moment, can be restored at a reasonable cost.

The Supreme Judicial Court has repudiated traditional common-law doctrine of landlord-tenant incorporating both negligence and contract principles. But despite this modernization of the law, the problem of providing decent housing for all citizens of the City of Boston, has thus far defied solution. All that the courts can attempt to achieve is to halt and reverse the deterioration of present housing stock. The phenomena associated with housing deterioration feed upon one another in a vicious circle

that is sustained by the social and psychological pathology of urban Boston. Since the causes of housing deterioration are as complex as they are varied, a judicial code enforcement mechanism cannot by itself attack them all. Preservation of the City's housing stock demands a comprehensive program.

This Court declares that whenever any building shall be injured by fire without the fault of the tenant, the landlord shall repair the same as speedily as possible, unless the building has been totally destroyed or destroyed to such an extent that repair is unreasonable. If the damage is reasonably "correctible", it does not make sense to this Court to excuse the landlord from repair, simply because the defect was caused by fire. To allow this excuse would be to perpetuate a gap through which persons may escape their contractual obligations.

As the Court has explained in previous decisions, in the nineteenth century, at common law, the landlord was allowed to recover in an action for use and occupation even though the premises were entirely destroyed. In days gone by, at common law, absent agreement to the contrary, destruction of a building on land held under lease did not entitle the tenant to terminate his obligations under the lease or to recover any portion of the rental paid in advance, even though such destruction deprived him of the benefits of the lease. Massachusetts courts thought this doctrine to be so oppressive that the doctrine of constructive eviction evolved. This Court draws guidance from that evolution. Where formerly the duty to restore was placed upon the tenant, a distinction was made between partial destruction of the leased premises as where leased land remained after the calamity, and total destruction as where the lease is of a single room or story of a building without land, and the entire building is destroyed. In the former case, the courts imposed upon the tenant the duty to pay rent. See, Fowler v. Bott, 6 Mass. 63 (1809); Roberts v. Lynn Ice Co., 187 Mass. 402 (1905). In the latter cases though, destruction being total, liability for rent ceased. See, Shawmut National Bank v. Boston, 118 Mass. 125 (1875); Ainsworth v. Mount Moriah Lodge, 172 Mass. 257 (1898). A similar rule prevailed in Roman law. See, Beckland, **Casus and Frustration in Roman and Common Law,** 46 Harv. L.R. 1281. Thus, the Massachusetts courts were departing from the landmark case of **Paradine v. Jane,** 82 Eng. Rep. 897 (1647). Even nineteenth century English courts could no longer countenance the absolute "undertaking" rule that **Paradine** imposed. See, **Taylor v. Caldwell,** 122 Eng. Rep. 309 (1863).

This Court seeks a doctrine that effectively and permanently eliminates the erroneous assumption that recognition of the legal relevance of frustration due to fire requires deviation in every case from the express and implied contractual terms. By this, the Court seeks to do justice in individual cases without requiring performances of a revolutionary task of deviating from the express or implied contractual terms. The question in cases involving disturbances to tenancies because of fire is whether the equities, considered in the light of sound public policy, require placing the risk of disruption or complete destruction of the contractual equilibrium on the defendant or plaintiff under the facts of a given case. That the performance may be made more difficult or more expensive does not excuse the duty to perform a contractual obligation. It is unfortunate, but the realities of living in Boston should make it very clear to landlord and tenant, when they enter in a contractual relationship, that there is a foreseeable threat of fire. What cannot be foreseen is the precise nature and the extent of the fire. The parties who enter into a landlord-tenant relationship must make their arrangements in advance, so that they rely with certainty on their contracts. If the impossibility persists for a length of time sufficient to go to the essence of the contract, this Court will not enforce that agreement. If the contract can be saved, it should be saved; it can be preserved by engrafting necessary qualifications upon it. Today, of course, under **Hemingway,** the tenant has to pay only for the fair rental value of the apartment in its defective condition. And if by the actions of the landlord, the tenant is unable to occupy an apartment, the fair rent

value of that apartment in its defective condition is zero. But, if the Supreme Judicial Court in **Boston Housing Authority v. Hemingway, supra,** has imposed upon owners other contractual principles, among which is the duty to restore, then this Court will apply to owners the same equitable standards that they previously accorded to tenants. Here, the Court is effectuating a metamorphical change in the magnitude of 180 degrees.

If the impossibility of performance was self-induced, that is, if one of the parties committed arson, that party cannot take advantage of his own wrong. In such a case he has prevented performance in a substantial sense. The historical importance of the crime of arson can be traced to the peculiar sacredness which early English law attached to men's habitation. This felony of arson (so called from the Latin **ardeo, I** burn) was at one time punished with the terrible retaliation of death by burning. Yet to destroy a house in any other manner than by fire was not regarded by the common law as a criminal offense at all. Arson was initially limited to the burning of the house of another man. Attention was concentrated on the interference with the rights, not of the owner, but of the immediate occupier. Arson was the only form of injury to property that was recognized by the common law as a crime. All other kinds of mischievous damage to it was merely trespasses, to which only a civil remedy was attached. Arson attacked the very fiber of society. "For a man's house is his castle," Coke, III Inst., c. 73. "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail — its roof may shake — the wind may blow through it — the storm may enter — the rain may enter — but the King of England cannot enter — all his force dares not cross the threshold of the ruined tenement!" William Pitt, Earl of Chatham, in a speech to the House of Lords.

Arsonists sap the vitality from a city. Thus, if it can be proven that the owner of a building did commit arson, that owner will be held strictly liable on the issue of restoring the building, even if there was total destruction. But even though this Court has ruled that arson was committed in this building, there is no evidence to suggest that the owners were responsible for the arson.

This Court finds and rules that Beacon Chambers is a licensed rooming house. Therefore, under G.L. c. 186, § 17, occupants of Beacon Chambers who have lived there for three (3) consecutive months are tenants-at-will. While occupants of a dwelling unit within a rooming house or lodging house for more than thirty (30) consecutive days and less than three (3) consecutive months, may only be terminated by a seven (7) day notice in writing to the occupant by the operator of such a dwelling unit, this does not translate the relationship into one of landlord-tenant. This does not give to the occupant the right to the protection of G.L. c. 239. Evidence can demonstrate that aside from G.L. c. 186, § 17, a tenancy has been established. If the property was under rent control, residents who have lived at Beacon Chambers for two (2) weeks would be considered tenants. But the presumption of law from which this Court operates, is that absent independent facts, occupants who have lived at Beacon Chambers less than three (3) consecutive months are licensees.

Even though both the licensee and the tenant can be determined by a seven (7) day written notice, there is a radical difference in the effect of that notice. Under G.L. c. 186, § 13, in the case of a rooming or lodging house, an action to recover possession of premises occupied for dwelling purposes may be brought seven (7) days after written notice if the rent is payable on either a weekly or daily basis. But this section applies only to residents who are tenants-at-will where the determination is without fault of the tenant, either by operation of law or by act of the landlord. In a licensee relationship, there is no need on the part of the owner to commence summary process, although it may be utilized, for once the licensee has been terminated the occupant has the same status as a civil trespasser.

Because of the length of time that many of the residents have occupied the building, it is not even crucial whether Beacon Chambers is or is not a lodging house. Tenancies

can be created even where the locus is a hotel. One who occupies a room in a hotel for twenty (20) years and has lived at Beacon Chambers for thirty (30) years, is a tenant, entitled to the full protection of law.

The plaintiff insisted that the building could be restored at a modest cost. It would be the Court's task to determine whether the restoration of the building was within a reasonable dollar amount. The Court is mindful the plaintiff class has minimal residential options in the housing market that exists in the Beacon Hill area.

There is no question that the Beacon Chambers is a structurally sound building. No real damage to the structural integrity of the building was suffered in the fire. The plaintiff introduced a plan which attempted to accomplish the restoration of the Beacon Chambers so that the tenancies of the previous tenants could be preserved in a normal fashion, at a modest cost. The architect's approach was to divide the overall estimate into three (3) major categories: costs directly related to fire; costs directly related to code requirements; and costs directly related to normal maintenance. The defense never attacked the integrity of the plaintiffs' plan for restoration; rather, the defense asserted that restoration of the building could not start until all permits were obtained and that it was not proper to allow minimum necessities as long as there were maximum possibilities. The plan submitted by the plaintiffs meets the code, but the defense contends "does not insure safety".

The greatest concern which the Court had was the problem with the funnelling of smoke. The testimony elicited at trial demonstrated that much of the smoke travelled because the fire doors that "protected" the building had malfunctioned.

The Court does perceive that there are problems with the plan. Until the plan has reached the final drawing stage, it would be impossible to ascertain whether the landlord could obtain all the necessary permits. There are problems facing both parties — it is for this Court to arrive at the ultimate truth. "The Supreme Court of the United States and the Court of Appeal will take care of themselves. Look after the courts of the poor who stand most in need of justice. The security of the republic will be found in the treatment of the poor and ignorant; in indifference to their misery and helplessness lies disaster." So stated Charles Evan Hughes. As one commentator has stated, "The enforcement of housing codes, or the failure to enforce them and the imposition of penalties on landlords who refuse to maintain their properties in adequate condition, or the failure to penalize — this is what instructs the poor about the American legal system, its doctrine and its operation."

The Court recognizes that many of these tenants feel a peculiar attraction to Beacon Chambers. It may well be that emotionally and physically, because of their age and health, many of the tenants feel that they are locked into Beacon Chambers and its surroundings. See, **Commonwealth v. DeCotis, 366 Mass. 234 (1974); Tai On Luck Corp. v. Circota d/b/a 70 Bayard St. Pharmacy, 316 N.Y.S. 2d. 173, on remand, 331 N.Y.S. 2d. 250 (1972).** The dilemma which weighs heavily upon this Court is whether it would be safer for these tenants to move back into Beacon Chambers, or to remain where they are. The threat of fire must be weighed against the threat to the tenants' mental and physical health. The Court is very mindful of public policy. But judicial determination of public policy cannot readily take account of sporadic and transitory circumstances. They should rather rest upon a durable moral basis. Mr. Justice Holmes proclaimed in dissent in **Rock Island, Arkansas, & Louisiana Railroad Company, 254 U.S. 141, 143 (1920),** that "Men must turn square corners when they deal with the Government"; this decency should not be forgotten, when the relationship involves one's neighbor. In the Court's search for an answer it must weigh the rights of the parties, examine the existing and evolving law, and then employ the courage of cornerstoning its decision on the truth.

In light of the total picture, which includes the potential damage to both the plaintiff and the defendants, the Court finds that the plaintiff has the resources to accomplish the plan. The building has neither been destroyed nor damaged to such an extent that

repair is unreasonable. The restoration of the building, in light of the value of the building, can be achieved reasonably.

But the Court will not order the restoration unless and until there are a sufficient number of tenants who will return. This Court will not engage itself in empty gestures. "Do not do unrighteousness in judgment; do not favor the poor, nor show defense to the rich, but in justice shall you judge your people." **Leviticus** 19:15. It would not be just to order restoration, unless the landlord can be assured that there are tenants who are committed to returning. In today's society, sadly, a thing in which people trust very much, is money. Good intentions to return cannot be solely relied upon. This Court asked for volunteer work to help in lowering the cost in restoring the building, and none was forthcoming. The landlord cannot be made to bear the burden unless he is assured of the tenants' return.

In light of the circumstances, the Court finds that a 13% rent increase would be justified. While a rent increase cannot be imposed upon the tenants, this Court will not impose restoration upon the landlord, if the Court feels that the landlord could no longer maintain the building. If the landlord had allowed the tenants to remain, restored the building and asked for a 13% increase, the Court would not find retaliation. While the landlord in these circumstances could ordinarily evict for any legal reason or for no reason at all, he is not free to evict in retaliation for his tenants reporting the code violations to this Court.

The plaintiffs' attorney may undertake any reasonable steps to notify the tenants. The Court will direct that within twenty-one (21) days of the date of this Order, the tenants of Beacon Chambers as defined by this Court and by statute, post with the Clerk of the Court, an amount equal to one month's rent, plus an increase of 13%. As soon as one hundred and fifteen (115) tenants of the three hundred and sixty-three (363) occupants indicate by this procedure, their desire to return, a permanent injunction will issue ordering the defendant to restore the premises known as Beacon Chambers. The defendant may implement a plan which is more extensive than that submitted by the plaintiff; and if the owners of Beacon Chambers are truly concerned with the safety of the building, they can retrofit Beacon Chambers; something that they could have done before the fire. In the long run, not only will the safety of the building be enhanced, but the insurance rates should be decreased.

Within fourteen (14) days of the date that one hundred and fifteen (115) tenants post the money, the defendants will submit to the appropriate departments final plans for approval of the restoration and pay plaintiffs' architects for their services. The plaintiffs are entitled to monitor the steps taken by the defendant to insure that the plan submitted by the plaintiff or a more extensive plan is achieved. Plaintiff may come back into Court for additional relief, if there is any appreciable delay.

If the plans are approved by the various city departments, the defendant is to proceed with the restoration, and complete said plan within four (4) months. However, if after approval by the various city departments, restoration contracts are not signed, the plaintiff may petition this Court, after proper notification, for receivership.

If the defendant cannot obtain the necessary city permits after exercising due diligence, the defendant may come back into this Court for reconsideration of the permanent injunction. If the defendant appeals and obtains a stay of this Court's order, and even if the decision and order of this Court are upheld on appeal, the defendant can come back to this Court for review and reconsideration. The Court is concerned that any appreciable delay may present additional factors which would make tentative repairs impossible as set out in the previous guidelines issued by this Court.

The tenants have not abandoned the building. It will be up to the tenants to determine whether they want to come back. Their actions will trigger the issuance of the final injunction. It is up to them to determine how the uniqueness of living at Beacon Chambers; it is up to them to decide if it is worth the commitment this Court asks them to make to return to Beacon Hill.

Just as this Court perceives abandonment of property can be halted by insisting on

repair and restoration of buildings, so can the doctrine of implied duty to repair, discourage arson. The State must act boldly to preserve its housing inheritance; let us always remember that society never truly owns its resources — these things are ours only while in passage to others.

## PLAINTIFFS' REQUESTS FOR RULINGS OF LAW

1. Neither allowed nor denied. No evidence at all before the Court.

2. Denied. Occupants residing at the Beacon Chambers on October 13, 1980, and who had been residing there for three (3) consecutive months were tenants-at-will entitled to notices to quit pursuant to G.L. c. 186, §§12, 13 or 17.

3. Occupants are licensees. Legally they are entitled to the notice, but on the equity side of the Court, there will be no enforcement.

4. Denied. They are licensees, who upon notice by the landlord, are civil trespassers if they do not move. Otherwise, hotels who have overnight guests who decide not to leave, will be forced to resort to the courts, and by that process their business will be destroyed.

4A. Allowed.

5. Allowed,

6. Allowed.

7. Neither allowed nor denied, as that is an issue which belongs more properly on the legal side of this case. The Court does rule that the occupants were dispossessed from their units by the owner, and that those occupants who were tenants retain their tenancy.

8. Neither allowed nor denied. This is an issue which more properly belongs on the law-side of this case.

9. Denied. The owner had a duty to repair the damages caused by the fire which duty continued after the tenants were compelled to leave.

10. The evidence was sufficient to allow the Court to find that the tenants have no adequate remedy at law.

## DEFENDANT'S REQUESTED SUBSIDIARY FINDINGS OF FACT

1. Allowed.

2. Allowed.

3. The Beacon Chambers Hotel was operated as a lodging house.

4. Allowed.

5. Allowed. See previous decisions of this Court in this case.

6. Allowed.

7. Allowed.

8. Denied.

9. Denied, except for e.

10. Neither allowed nor denied.

11. Neither allowed nor denied.

12. Allowed in part.

13. Neither allowed nor denied.

14. Neither allowed nor denied. The term 'relocated' is misleading.

15. Neither allowed nor denied. The Court's Order as to tenants opting into the class will determine whether there are assurances that there are people who want to go back.

16. Allowed.

17. Neither allowed nor denied. The crucial question is whether the Court has approved the evictions.

## DEFENDANT'S REQUESTED ULTIMATE FINDINGS OF FACT

1. Denied.

2. Denied. Damaged but not destroyed.

3. Denied.

4. Denied.

5. Denied.

6. Neither allowed nor denied as not relevant, and Court's Order as to tenants opting into the class will determine whether tenants want to go back.

7. Allowed.

8. Denied.

9. Neither allowed nor denied. Court's Order disposes of landlord's concern.

10. Denied as to tenants.

11. Denied.

## DEFENDANT'S REQUESTED RULINGS OF LAW

1. Denied. Even those rooms which were more damaged than the others, the Court gives permission to the defendant to move them to a less damaged part of the building.

2. Neither allowed nor denied. It is up to the Court to determine whether to issue execution.

3. Allowed.

4. Allowed as to former occupants, denied as to tenants.

5. Denied. Depending upon the numbers of tenants who wish to return, the Court perceives that not all tenants will wish to return, therefore, giving the defendant more flexibility in setting aside certain floors for the tenants, and thus, reducing the costs.

E. GEORGE DAHER
CHIEF JUSTICE